IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

OTIS CHAMBERS,                          §
                                        §
                    Plaintiff,          §
                                        §  Civil Action No. 3:05-CV-1533-D
VS.                                     §
                                        §
JOSEPH T. RYERSON & SON, INC.,          §
et al.,                                 §
                                        §
                    Defendants.         §

MEMORANDUM OPINION
AND ORDER

In this action by a terminated African-American employee alleging claims for race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and § 21.051 of the Texas Commission on Human Rights Act ("TCHRA"), Tex. Labor Code Ann. §§ 21.001 *et seq.* (Vernon 2006),[1] and for unlawful discharge and interference with attainment of a permanent incapacity retirement pension under § 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140, defendants move for summary judgment. For the reasons that follow, the court grants the motion.

---

[1] "Chapter 21 was entitled the Texas Commission on Human Rights Act until the abolishment of the Commission on Human Rights. In 2004, the 'powers and duties' of the Commission on Human Rights were transferred to the Texas Workforce Commission Civil Rights Division." *Tex. Dep't of Criminal Justice v. Guard*, 2007 WL 1119572, at *2 n.3 (Tex. App. 2007, no pet. h.) (not designated for publication) (citations omitted) (citing *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 377-78 (Tex. 2004), and Tex. Lab. Code Ann. 21.0015 (Vernon 2006)). For clarity, the court will refer to this claim as brought under the TCHRA.

I

Plaintiff Otis Chambers ("Chambers"), a 48-year-old African-American, was employed by defendants Joseph T. Ryerson & Son, Inc. and Ryerson Tull, Inc. (collectively, "Ryerson")[2] for 23 years in Ryerson's Dallas steel processing plant.[3]  During his employment with Ryerson, Chambers worked in various positions operating steel-cutting equipment.  Prior to the events giving rise to this lawsuit, Chambers suffered an injury to his right hand, requiring surgery.  As a result, two fingers on his right hand are permanently immobilized in a bent position.  Chambers also underwent surgery on both of his eyes for detached retinae, but the surgery was unsuccessful and Chambers still experiences compromised vision, even with corrective lenses.  Chambers is a member of the Shopmen's Local Union No. 1536 of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers (the "Union"), and in 2000 became a participant in Ryerson's Pension Plan for members of the Union.

---

[2]Ryerson maintains that Ryerson Tull, Inc. has never been Chambers' employer; instead, Joseph T. Ryerson & Son, Inc., a wholly-owned subsidiary of Ryerson, Inc., was his employer at all relevant times.  D. Br. 1 n.1.  Because Ryerson is entitled to summary judgment for the reasons explained in this opinion, the court need not resolve this issue.

[3]The court recounts the evidence in a light favorable to Chambers as the summary judgment nonmovant and draws all reasonable inferences in his favor.  *E.g., U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.) (citing *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000)).

At Ryerson's Dallas plant, all wage employees represented by the Union are subject to discipline under the Plant Conduct Rules ("Conduct Rules").  The Conduct Rules set out 23 rules and levels of discipline for the first, second, and third violations of each rule.  Rule 23 of the Conduct Rules provides that "[f]or those instances where an employee's conduct results in the violation or offense of three (3) [Conduct Rules] in a one year period," the discipline is "Discharge."  P. App. 221.  The foremen at the Dallas plant use the Conduct Rules to determine whether an employee has violated Conduct Rules and to determine the appropriate level of discipline.  The foremen are responsible for identifying Conduct Rules violations and forwarding that information to superintendent Ken Jones ("Jones").  Jones reviews all the disciplinary recommendations made by foremen and is responsible for making the final disciplinary and/or termination decision.

In June 2003, while working as an aluminum saw operator, Chambers received a written warning for violating Plant Conduct Rule 9 (failure to follow safe operating procedures), when a rack fell onto another rack where Chambers had placed the remote control box for the rolling crane, causing damage to the box.  Chambers disputed that he was the cause of the equipment damage.

Early in the summer of 2003, Chambers began experiencing constant nausea and related illness.  His doctor diagnosed the symptoms as being caused by colon polyps, and in August 2003

Chambers underwent surgery to remove the polyps.  Just before the surgery, Chambers was informed that Ryerson was abolishing his job on the aluminum saw and demoting him to a regular operator position.  This reassignment meant that Chambers' work schedule changed from daylight hours to working from 6 p.m. to 3 a.m. Chambers maintains that he was unfamiliar with the stockman duties, and Ryerson provided him with no training on how to safely or effectively perform the duties of stockman.

In September 2003 Chambers received a second disciplinary warning, again for failing to follow safe operating procedures. Specifically, while operating a side loader, Chambers neglected to remove all obstructions from the side loader's operational path, which resulted in damage to an overhead crane.  Operations Supervisor Russell Wiley ("Wiley") issued Chambers a written warning and three-day suspension for negligence.

On October 31, 2003 Wiley confronted Chambers about the number and duration of Chambers' bathroom breaks and his low level of productivity.  Chambers alleges that, at first, he attempted to make Wiley understand that he was merely taking necessary breaks, but he soon realized this was pointless.  The day after Wiley confronted him, Ryerson issued a third offense to Chambers, sent him home for the remainder of his shift without pay, and placed him on a five-day suspension, at the end of which he would be terminated.

- 4 -

During the five-day suspension period, Chambers filed a grievance and requested a hearing to contest his termination. At the meeting, Chambers told Jones that he wanted to keep his job, he was having difficulties with his vision, and the reason he was in the bathroom on October 31, 2003 was because of the effects of his recent surgery. Chambers suggested that he would welcome training since he was new to the stockman position. Jones strictly adhered to Conduct Rule 23, however, and notified Chambers that it was terminating him.

In December 2003 Ryerson and the Union reached an agreement under which Chambers could be reinstated on the condition that he sign a "Last Chance Agreement" ("LCA"). The LCA would resolve Chambers' grievances and provide him reinstatement with full seniority, a higher skilled position at a higher wage rate, and a more favorable work schedule. The LCA, however, would, among other things, waive all future access to the grievance procedure, require that Chambers lose six weeks of pay, and subject Chambers to immediate termination for any infraction occurring prior to October 31, 2004, as determined by Ryerson. Chambers rejected this offer.

Chambers filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC found reasonable cause to believe that there was a violation of Title VII. Chambers then filed this suit, alleging that Ryerson's actions constituted unlawful discrimination on the basis of his

race, in violation of Title VII, 42 U.S.C. § 1981, and Tex. Lab. Code Ann. § 21.051 (Vernon 2006).   He also asserts a claim for unlawful discharge under 29 U.S.C. § 1140, maintaining that by terminating Chambers, Ryerson purposefully interfered with his attainment of rights to which he would have become entitled under an employee welfare plan providing disability benefits.[4]

Ryerson moves for summary judgment on Chambers' race discrimination claims on the grounds that he cannot demonstrate a prima facie case and cannot establish that Ryerson's legitimate, nondiscriminatory reasons for its actions are pretextual.[5]   For similar reasons, it seeks summary judgment dismissing Chambers' ERISA claim.

II

Because Ryerson will not have the burden of proof at trial on Chambers' claims, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support them.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Once it does

---

[4]Chambers filed the lawsuit *pro se*.   The magistrate judge appointed Hal K. Gillepsie, Esquire——a recognized employment-law specialist——to represent Chambers based on his inability to retain counsel, his lack of financial resources, and on the EEOC's determination that there was reasonable cause to believe that Ryerson had violated Title VII.   *See* Sept. 1, 2005 Mem. Order 2 (Kaplan, J.).

[5]Ryerson filed on February 23, 2007 a motion to strike portions of Chambers' summary judgement evidence.   Because Ryerson is entitled to summary judgment even if the court considers the evidence to which Ryerson objects, the court denies the motion to strike as moot.

so, Chambers must then go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). Summary judgment is mandatory if plaintiff fails to meet this burden. *Little*, 37 F.3d at 1076. An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *Edgar v. Gen. Elec. Co.*, 2002 WL 318331, at *4 (N.D. Tex. Feb. 27, 2002) (Fitzwater, J.) (citing *Celotex Corp.*, 477 U.S. at 323).

III

The court begins with Chambers' race discrimination claims. Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). Under the TCHRA, "[a]n employer commits an unlawful employment practice if because of race . . . the employer . . . discharges an individual[.]" Tex. Lab. Code Ann. § 21.051 (Vernon 2006). Claims of racial discrimination brought under Title VII, § 1981, and the TCHRA are governed by the

same evidentiary framework. *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) ("[T]he law governing claims under the TCHRA and Title VII is identical."); *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996) ("Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII."); *Caballero v. Cent. Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993) ("Another stated purpose [of the TCHRA] is to coordinate and conform with federal law under Title VII of the Civil Rights Act of 1964, as amended" (internal citations omitted)).

In the present case, Chambers "must present sufficient evidence to create a fact issue regarding race discrimination, either through direct or circumstantial evidence." *Lyons v. Burlington Coat Factory Warehouse Corp.*, 2004 WL 515585, at *4 (N.D. Tex. Jan. 30, 2004) (Kinkeade, J.) (race discrimination claim). A plaintiff who offers "sufficient direct evidence of intentional discrimination should prevail, just as in any other civil case where a plaintiff meets his burden." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) (citing *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 n.6 (5th Cir. 1994)). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893,

897 (5th Cir. 2002) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995)).  Such evidence of discrimination, however, is rare.  *See, e.g., Rutherford v. Harris County, Tex.*, 197 F.3d 173, 180 n.4 (5th Cir. 1999) (Fitzwater, J.) (stating that because direct evidence is rare in discrimination cases, plaintiff must ordinarily use circumstantial evidence to satisfy burden of persuasion).

In a case such as this one, where Chambers does not rely on direct evidence of discrimination, he can prove discrimination using the "modified *McDonnell Douglas* approach." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (age discrimination case).  As modified, *McDonnell Douglas* consists of three stages.  First, Chambers must establish a prima facie case of discrimination, which, if shown, raises an inference of unlawful discrimination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  Second, the burden shifts to Ryerson to articulate a legitimate, nondiscriminatory reason for discharging Chambers.  *See id.* at 506-07.  Ryerson's burden is one of production, not proof, and involves no credibility assessments.  *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384-85 (5th Cir. 2003) (Fitzwater, J.) (age discrimination case).  Third, if Ryerson meets its production burden, then Chambers may proceed under one of two alternatives: the pretext alternative or the mixed-motives alternative.  *See Rachid*, 376 F.3d at 312.  Under the pretext

alternative, Chambers must "offer sufficient evidence to create a genuine issue of material fact . . . that [Ryerson's] reason is not true, but is instead a pretext for discrimination." *Id.* (internal quotations omitted).  Under the mixed-motives alternative, Chambers must offer sufficient evidence to create a genuine issue of material fact "that [Ryerson's] reason, while true, is only one of the reasons for its conduct, and another motivating factor is [Chambers'] protected characteristic[.]" *Id.* (internal quotations omitted).

To establish a prima facie case of discriminatory discharge, Chambers must show that he (1) is a member of a protected class,[6] (2) was qualified for the position, (3) was subject to an adverse employment action, and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, that other similarly situated employees were treated more favorably. *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) (addressing discharge-based § 1981 claims).

IV

Ryerson maintains that Chambers has not established the second element of the prima facie case because Chambers was not qualified for his position.  It argues that Chambers was fired for just cause pursuant to the Conduct Rules and the Collective Bargaining

---

[6]Ryerson does not challenge the fact that Chambers is a member of a protected class.

Agreement, and that to the extent Chambers argues he is "permanently incapacitated" and unable to perform the duties of his position, he cannot demonstrate that he was or is qualified for the position.  Chambers responds that, as a veteran employee of more than 20 years' tenure, he was clearly qualified for his job. According to Chambers, the stockman position that he held at the time of his termination was classified as a "regular operator" employee position, but he had previously worked as a "Skilled" employee operating a plate saw, and as a "Higher Skilled" employee operating the burner.  He maintains that there is no evidence that he failed to meet qualifications for the job he held with Ryerson, and that his ERISA claim does not render him "unqualified," because he testified that he was and is physically able to perform his job duties.

The court rejects Ryerson's contention that Chambers has failed to present sufficient evidence that he was qualified for the job from which he was terminated, and it similarly rejects Ryerson's argument that the fact that Chambers was fired for "just cause" rendered him unqualified.  Ryerson cites *Williams v. Simmons Co.*, 185 F.Supp.2d 665 (N.D. Tex. 2001) (Solis, J.), for the proposition that when an employee fails to meet his employer's standards, he may be found to be unqualified for the job. Although, as Ryerson points out, Judge Solis wrote in *Williams* that "[t]he Court has already determined that Plaintiffs were fired for

the just cause of not performing their jobs; thus, they were not qualified," *id.* at 682, the employees were actually fired for failing to meet certain production levels. *Id.* at 671. Judge Solis relied on this fact to hold that the plaintiffs were not qualified for their positions, because they could not meet the performance levels outlined by their employer. *Id.* Chambers was not terminated, however, on the ground that he was unable to perform the work; rather, Ryerson discharged him because he had received three disciplinary warnings for violating company policy, and, under Conduct Rule 23, he was subject to mandatory discharge. Although Chambers received the third disciplinary warning for lack of productivity and prolonged absence from his work area, this does not establish under the reasoning of *Williams* that Chambers was unqualified. Chambers has submitted sufficient evidence of his qualifications for his position, including his more than 20 years of experience with Ryerson and the fact that he held more demanding positions, to raise a fact issue on this element of his prima facie case.

                                   V

Ryerson next contends that Chambers cannot establish that he suffered an adverse employment action. It argues that the only reason Ryerson terminated Chambers' employment was because he was unwilling to accept the terms of the LCA, thereby effectively choosing to resign, which does not qualify as an adverse action.

Chambers responds that he suffered an adverse employment action by being terminated *before* Ryerson offered him the LCA. He posits that it was impossible for him to terminate his own employment by rejecting the LCA because it was not offered to him until after he was fired and filed a grievance. Chambers maintains that he had no duty to try to regain his job through the grievance procedure, and the responsibility for his termination did not shift back to him simply because he opted to grieve his discharge.

Chambers has presented adequate evidence to permit the reasonable finding that he suffered an adverse employment action. Although he could have regained his employment by accepting the LCA, this does not change the fact that Ryerson terminated his employment nearly one month before it offered him the option of returning to work by signing the LCA. While it is true that, by agreeing to a negotiated resolution reached by Ryerson and the Union, Chambers could have remedied a discharge that had already taken place, this does not alter the fact Chambers was terminated beforehand, thereby suffering an adverse employment action. *See, e.g., DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 442 (5th Cir. 2007) (per curiam) ("[T]ermination is clearly an adverse employment action[.]" (citing *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000)). A reasonable trier of fact could find that signing the LCA provided Chambers a remedy for an adverse employment action that had already taken place, but

that it did not alter the nature of the termination itself.   A
remedy may relieve a wrong without changing the character of the
wrong.

VI

Finally, Ryerson contends that Chambers cannot establish that
similarly situated employees outside his protected class were
treated more favorably.

A

In discriminatory discharge cases based on an employee's
alleged violation of a "work rule," a plaintiff "may establish a
prima facie case by showing 'either that he did not violate the
rule or that, if he did, white employees who engaged in similar
acts were not punished similarly." *Mayberry v. Vought Aircraft
Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong
Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)).   The Fifth Circuit
narrowly interprets the "similarly situated" requirement to mean
"nearly identical."   *E.g., Preston v. Tex. Dep't of Family and
Protective Servs.*, 2007 WL 462000, at *4 (5th Cir. Feb. 7, 2007)
(per curiam) (unpublished opinion) (holding that plaintiff's burden
"was to establish that the misconduct for which she was discharged
was nearly identical to that engaged in by an employee of another
race whom [her employer] retained." (quotation marks omitted)
(citing *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir.
1982)); *Edwards v. Grand Casinos of Miss., Inc.*, 145 Fed. Appx.

- 14 -

946, 948 n.3 (5th Cir. 2005) (per curiam) (declining to "resolve the question of 'similarity' by looking at the circumstances broadly, to see only whether the comparators dealt with the same supervisor, worked under the same job description, and were subject to the same standard"). Thus to establish a prima facie case, Chambers must show that others who engaged in "nearly identical" misconduct were not discharged or subjected to the same adverse employment action as he was. *Preston*, 2007 WL 462000, at *4; *see also Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (age discrimination case) (citing *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990) (per curiam)).

"[I]n order for circumstances to be nearly identical, the misconduct itself must be nearly identical." *Bouie v. Equistar Chems. LP*, 188 Fed. Appx. 233, 237 (5th Cir. 2006) (per curiam) (citing *Perez v. Tex. Dep't of Criminal Justice,* 395 F.3d 206, 213 (5th Cir. 2004)). "[C]omparably serious misconduct" is insufficient by itself to support a finding that employees are similarly situated. *Perez*, 395 F.3d at 213. And the "conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001). "The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage is a stringent standard——employees

with different responsibilities, different supervisors, different capabilities, different work rule violations, or different disciplinary records are not considered to be 'nearly identical.'" *Dotson v. Gulf*, 2006 WL 44071, at *7 (S.D. Tex. Jan. 9, 2006) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514-15 (5th Cir. 2001)).

In *Perez*, for example, the Fifth Circuit held that a jury instruction that permitted a finding of discrimination if the jury determined that the Caucasian employees' misconduct was of "comparable seriousness" to the plaintiff's was reversible error. *Perez*, 395 F.3d at 212. There, the plaintiff, who was Hispanic, was subjected to an internal affairs investigation after he was arrested and charged with felony assault for the off-duty stabbing of a former inmate. *Id.* at 208-09. His employer, the Texas Department of Criminal Justice, concluded that Perez had violated agency rules by engaging in conduct that jeopardized the integrity of the agency, and, under agency guidelines, recommended that he be terminated. *Id.* at 209. Perez sued under Title VII action, alleging that similarly situated Caucasian employees had been treated more favorably: one had been arrested for involuntary manslaughter, the other had been arrested after initiating a drunken assault, but neither was subjected to an internal affairs investigation and neither was terminated. *Id.* at 213-214.

On appeal, the Fifth Circuit explained that despite the

similarity in the degree of seriousness of the three crimes, this fact alone was insufficient to support a finding that Perez had made out a prima facie case of discrimination.  The panel concluded that the distinctions between Perez, on the one hand, and the two Caucasian employees, on the other, including Perez's refusal to explain his actions in response to his employer's inquiries and the fact that only Perez had been accused of assaulting an ex-inmate, "while seemingly not relevant under the rubric of comparable seriousness, could be relevant to the question of whether Perez [and the two Caucasian employees'] respective circumstances were nearly identical."  *Id.* at 214.   The court held that the jury instruction constituted reversible error because it permitted a finding that plaintiff has established a prima facie case if the jury found that the misconduct was "comparably serious."

Similarly, in *Dodge v. Hertz*, 124 Fed. Appx. 242 (5th Cir. 2005) (per curiam) (sex discrimination case), the Fifth Circuit held that the plaintiff, who had been terminated for altering numerous rental contracts to increase fraudulently his incentive-based compensation, was not "nearly identical" to an employee outside the protected class who was not terminated, even though she was disciplined for "dishonesty" when money from her branch "went missing."  *Id.* at 243-44.   The panel reasoned that although both employees had engaged in "dishonest" conduct, "the mere fact that two situations can be classified in the same broad category is a

far cry from their being nearly identical." *Id.* at 244. Accordingly, the court held that the plaintiff had not established a prima facie case of intentional discrimination. *Id.; see also Brown v. United Parcel Serv. Inc.*, 2007 WL 1598180, at *1 (5th Cir. June 4, 2007) (per curiam) (unpublished opinion) (holding that stealing $160 from customer was not nearly identical to forging customer signature in order to drop off packages, even though both types of misconduct could be classified as "dishonest"); *Bouie*, 188 Fed. Appx. at 237 (holding that employee who was terminated for failure to comply with two safety protocols was not "nearly identical" to Caucasian employees who were not fired for failing to comply with only one safety protocol, even when Caucasian employees violated allegedly more serious protocols); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (holding in reverse discrimination case that employees were not nearly identical, even though all were accused of removing company assets, where Caucasian employees removed tire changing machine worth several thousand dollars and African-American employee removed two boxes of shampoo and hair coloring, the value of which was "dramatically less").

B

Chambers compares his treatment to Ryerson's treatment of Robert Dooley ("Dooley"), who is Caucasian. Like Chambers, Dooley received three disciplinary actions within a 12-month period and was therefore subject to termination under Plant Conduct Rule 23.

Dooley had caused the destruction of company equipment and/or property on three separate occasions; each time, Dooley was disciplined for violations of Conduct Rule 9 (failure to follow proper safety procedures). But after Dooley's third disciplinary action——at which point he was subject to Rule 23——Ryerson did not terminate him. Instead, he was sent back to complete his shift with no loss of pay, and he continued to report to work for the next two days. Without having to request one, Dooley received a hearing on his rules violation with Jones, the foreman, and a Union representative. At the meeting, Jones asked Dooley to go home and prepare a list of his strengths and weaknesses. Dooley was paid for this time away from work. He returned the following day, as Jones had requested, and provided the list that he had prepared at home. Dooley was not disciplined. Instead, Jones drew up a performance improvement plan to help Dooley keep his job. Jones offered Dooley training, mentoring, and suggestions for how to improve his work performance. Jones also offered Dooley an LCA that required that he avoid violating Conduct Rule 9, the safety practices rule, for one year. Chambers argues that, viewed in a light most favorable to him, the evidence is sufficient to raise a genuine issue on the question whether Dooley was similarly situated to Chambers but received more favorable treatment.

Ryerson maintains that Dooley and Chambers were not similarly situated because Dooley's third violation was for negligent action

- 19 -

resulting in the destruction of company property, while Chambers'
third violation was for lack of productivity and prolonged absence
from his work area.  It argues that it did not view these as
similar infractions because Dooley's involved accidental conduct
while Chambers' involved intentional misconduct.  To support its
argument that Chambers and Dooley were not similarly situated,
Ryerson also points to evidence that Chambers used profanity and
argued with his supervisor.  Finally, in its reply brief, Ryerson
cites evidence in Chambers' appendix that Dooley was a Union
representative at the time he violated Rule 23 and was given his
LCA.  Chambers is not, and has never been, a Union representative.

Chambers maintains that he and Dooley were "nearly identical."
He points out that the Conduct Rules provided that termination
could be based on any combination of rules and was not limited to
three violations of the same particular Conduct Rule.  Chambers
argues that he and Dooley both violated three rules, and it is
immaterial whether they violated the same three rules, because they
were each subject to termination under Rule 23 for accumulating
three warnings.  Chambers denies having used profanity, and he
denies that he acted in a confrontational manner when Wiley began
harassing him about being in the bathroom.  He also points to
Dooley's employment history and argues that Dooley had a history of
"confrontations and profanity-ridden screaming matches with his
supervisors."  P. Br. 27.  Chambers argues that, viewed in a light

most favorable to him, the evidence is sufficient to raise a genuine issue on the question whether Dooley was similarly situated but received more favorable treatment.

C

Even disregarding Ryerson's contention that Chambers engaged in confrontational conduct—which Chambers denies[7]—the court holds that Chambers has failed to adduce sufficient evidence to permit a reasonable jury to find that he and Dooley engaged in "nearly identical" misconduct. A reasonable jury could only find that Chambers engaged in more serious misconduct than did Dooley.

The third act of misconduct for which Dooley was cited was a violation of Rule 9; the third act of misconduct for which Chambers was cited was a violation of Rule 3. An infraction of Rule 3 is treated under the Conduct Rules as being more serious than an infraction of Rule 9. Plant Conduct Rule 9 applies to "violations of, [or] disregard for safe practices. . . includ[ing] accidents where the employee has been found to be the root cause." P. App. 220. Plant Conduct Rule 3 applies to "[n]egligence resulting in inferior work, breakage of tools and equipment, or waste of time,

---

[7]Chambers filed on January 22, 2007 a motion to strike, as inadmissible hearsay, Wiley's handwritten notes that detail the alleged confrontation between Wiley and Chambers on October 31, 2003. Because the court holds that Chambers has not met his burden of establishing a prima facie case—even without considering any evidence of Chambers' allegedly confrontational conduct—the court need not address the admissibility of Wiley's notes. The motion to strike is therefore denied as moot.

materials and/or supplies." *Id.* For the first violation of Rule 9, the recommended disciplinary action is a written warning, for the second violation, a three-day suspension, and for the third violation, discharge. Violations of Rule 3 are punished more severely. The first violation calls for a five-day suspension, and the second violation results in discharge. Three strikes are allowed for Rule 9 violations, but only two strikes for Rule 3 violations.[8]

Chambers urges the court to view the two employees' conduct broadly, focusing on the fact that both he and Dooley violated three Conduct Rules, which, under Rule 23, should result in termination. He maintains that whether the infractions underlying the determination were the same is immaterial, citing the Tenth Circuit's opinion in *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992), for the argument that to be "similarly situated," the offenses need only be of comparable seriousness. The court disagrees. In the Fifth Circuit, similarity measured at a broad level is insufficient. *See, e.g., Perez*, 395 F.3d at 213 ("In instructing, without more, that the employees' underlying misconduct must be comparably serious, the district court erroneously suggested that comparably serious misconduct was by

---

[8]The court does not suggest that Chambers twice violated Rule 3. But the differences in discipline illustrate the distinctions in the seriousness with which Rule 3 and Rule 9 infractions are treated.

itself enough to make employees similarly situated.  A correctly worded instruction would have made clear that the jury must find the employees' circumstances to have been nearly identical in order to find them similarly situated."); *Edwards*, 145 Fed. Appx. at 948 n.3.  The conduct for which the employee was fired must be nearly identical to that of the comparator.  *Mayberry*, 55 F.3d at 1090. A reasonable jury could not find based on the summary judgment evidence that the misconduct for which Chambers was terminated was nearly identical to the misconduct in which Dooley engaged. Dooley's third Conduct Rules violation occurred when he negligently angled a crane, causing the cabling to become entangled around the crane arm, rendering the crane inoperable for the rest of the shift.  In Chambers' third infraction, he was approached about his productivity, given a written warning, and sent home for violating Rule 3 through "negligence resulting in waste of time."  P. App. 237.

Chambers argues that Dooley's third violation, although arising under a different rule, is essentially the same as Chambers' third violation, because it "was based on negligence as described in Rule 3."  P. Br. 29.  This argument is flawed in two respects.  First, given the more severe punishment specified for a Rule 3 violation, a reasonable jury could only find that Ryerson viewed a violation of that Rule as more serious than a Rule 9 violation, and, under the circumstances, found that Dooley's

misconduct did not warrant termination.

Second, in determining whether a violation is "nearly identical," the court must consider the *conduct* underlying the rule violation, not merely the identity of the rule that was violated. Here, as in *Dodge*, even if Dooley's and Chambers' third rule violations could both be classified under the broad category of "negligence" (which Ryerson denies), that classification is not determinative given the differences in the underlying conduct. *See Dodge*, 124 Fed. Appx. at 244. In this case, the conduct underlying Chambers' Rule 3 violation was not the same as that for which Dooley received his third Rule 9 violation. Chambers was found to have violated Rule 3 when his employer noticed his decreased productivity level and his prolonged bathroom break. This is different misconduct from Dooley's third Rule 9 violation, based on his disregard of safety practices resulting in damaging equipment.[9] In *Dodge* the Fifth Circuit did not find to be dispositive the fact that both acts of misconduct broadly fell within the "dishonesty" category. *Id.* Similarly, applying Fifth Circuit precedent, this court concludes that the fact that Dooley's and Chambers'

---

[9]While the court may think that conduct that jeopardizes safety should be treated with equal, if not greater, opprobrium than that which involves negligence that results in inferior work, Ryerson, as the employer, was entitled in establishing its work rules to adhere to its own race-neutral views (perhaps adopted through collective bargaining) about the relative severity of such misconduct. Additionally, it is undisputed that these Rules and the progressive discipline applicable to each were already in place when Chambers and Dooley committed the infractions in question.

respective third acts of misconduct could be classified as "negligence" does not control, given that the underlying acts are significantly different.

In addition to "nearly identical" conduct, the employees' circumstances must be "nearly identical." *Holloway v. Dep't of Veterans Affairs*, 2006 WL 1168893, at * 5 (S.D. Tex. Apr. 28, 2006) (citing *Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 257 (5th Cir. 1999)). Chambers' and Dooley's circumstances were not nearly identical, because Dooley was a Union representative, and Chambers was not. Ryerson cites *Okoye* and argues that because Dooley and Chambers held different positions——Dooley was a Union representative, and Chambers was not——they cannot be found "nearly identical." In *Okoye* the Fifth Circuit explained that the plaintiff, a nurse practitioner employed by the county jail, could not establish disparate treatment by comparing herself to three "prison officials with different responsibilities" than those of the plaintiff. *Okoye*, 245 F.3d at 515; *see also Alston v. N.Y. City Transit Auth.*, 1999 WL 540442, at *6 (S.D.N.Y. July 26, 1999) (holding plaintiff did not establish disparate treatment by pointing to fact that he was denied access to his personnel file while non-African American union representatives were allowed access, because "[e]mployees are not similarly situated where their duties and responsibilities are not the same or at least comparable . . . [and] [t]here can be no comparison drawn between plaintiff

and a union representative."). The fact that Dooley was a Union representative, even if not in itself dispositive, further distinguishes him from Chambers and supports the conclusion that the two employees were not "nearly identical." Ryerson's treatment of a Union representative could clearly differ from its treatment of a regular employee for reasons unrelated to race.[10]

Accordingly, the court holds that Chambers has not met his burden of producing evidence from which a reasonable jury could find that he and Dooley were "nearly identical." Because Chambers does not point to any other similarly-situated employees who received preferential treatment,[11] the court holds that he has not produced evidence that would permit a reasonable jury to find in

───────────────

[10]Chambers also argues that a side-by-side comparison of his LCA with the one given to Dooley reveals that Ryerson treated Dooley more favorably. A reasonable jury could not find from this evidence, however, that similarly-situated employees were treated differently, because the court has already found that Chambers and Dooley engaged in different types of misconduct and, because of Dooley's status as a Union representative, had different circumstances. Thus they were not similarly-situated, and the differences in their LCA agreements are immaterial.

[11]In his recitation of the facts, and as his arguments regarding pretext, Chambers points to evidence that a Hispanic employee, Humberto Fonseca, made at least seven documented errors that Ryerson simply ignored. He also adduces evidence that another Hispanic employee named "Able" was caught sleeping in the bathroom, but that foreman Moncibaiz looked the other way, asking Dooley to go wake Able up so that Moncibaiz would not have to write him up. Chambers does not argue that either of these employees engaged in conduct that was "nearly identical" to his. Accordingly, even if he intends to use evidence of these other employees to establish a prima facie case, he has not shown that they engaged in "nearly identical" misconduct but were treated favorably.

his favor on the fourth element of his prima facie case.

VII

In addition to offering evidence to establish a prima facie case of discrimination based on a work-rule violation, Chambers also cited evidence of pretext.  The court now explains why Ryerson is entitled to summary judgment regardless of this evidence.

A Title VII plaintiff can raise a fact issue on the question of pretext "by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973)).[12]  Chambers has adduced evidence that the court will assume would be sufficient to enable a reasonable jury to find that Ryerson's proffered reason for terminating him is pretextual.  Specifically, he has produced proof that Ryerson never disciplined Dooley for various oral threats; that Humberto Fonseca, a Hispanic employee, committed seven documented errors over ten months, for which he was not disciplined; that Ryerson turned a blind eye when Able, a Hispanic employee, slept in the bathroom for the better part of an hour; that Ryerson falsely insisted that Chambers' employment ended, not because he was terminated, but because Chambers chose not to accept the LCA; that Ryerson made several false statements to the EEOC regarding the circumstances

---

[12]This principle applies as well to Chambers' § 1981 and TCHRA claims.

- 27 -

surrounding Dooley's termination; that Ryerson has exaggerated Dooley's good qualities throughout this litigation; that Ryerson has suggested in this litigation that Chambers' attitude justified the decision to terminate him, even though there is no mention of any alleged attitude problem until Chambers' very last censure; that Ryerson has made false comparisons in this litigation between Chambers' productivity and that of other stockmen; and that Foreman Martinez had a reputation for having conflicts with African-American employees whom he supervised.   This evidence notwithstanding, Ryerson is entitled to summary judgment because Chambers did not establish a prima facie case.

In the absence of direct evidence of discrimination, a plaintiff seeking to prove a Title VII claim using the *McDonnell Douglas* paradigm "must establish a prima facie case of discrimination."   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).   Generally, a plaintiff need only make a very minimal showing to establish a prima facie case.   *See Nichols*, 81 F.3d at 41 (quoting *Thornbrough v. Columbus & Greenville R.R. Co.* 760 F.2d 633, 639 (5th Cir. 1985)).   It is clearly established in the context of a work-rule case, however, that a plaintiff seeking to prove discrimination by the *McDonnell Douglas* burden-shifting framework must show, as the fourth element of his prima facie case, that "'he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished

- 28 -

similarly.'" *Mayberry*, 55 F.3d at 1090 (quoting *Green*, 612 F.2d at 968).[13]  As discussed above, *supra* § VI(A), the Fifth Circuit has rigidly applied the "nearly identical" standard in determining whether a plaintiff has satisfied the fourth element of the prima facie case, and it routinely affirms summary judgment when a plaintiff cannot meet this element.  *See, e.g. Brown*, 2007 WL 1598180, at * 1; *Preston,* 2007 WL 462000; *Bouie*, 188 Fed. Appx. at 236-37; *O'Neal* v. Roadway Exp., 181 Fed. Appx. 417, 420 (5th Cir. 2006) (per curiam); *Burnett v. Thompson*, 31 Fed. Appx. 839, 2002 WL 261526, at *3 (5th Cir. Feb. 6, 2002) (per curiam); *Mayberry*, 55 F.3d at 1090.  Chambers does not dispute that this is a work-rule case, and he offers no other theory of recovery for the discrimination he allegedly suffered.  Further, he does not argue or point to any case that would permit his claim to survive summary judgment where he has not established a prima facie case.

Accordingly, because the court concludes that Chambers has not established a prima facie case of discrimination in a work-rule violation case, Ryerson is entitled to summary judgment dismissing his race discrimination claims.

---

[13]Chambers has neither argued nor presented evidence that he did not violate the Conduct Rules on which Ryerson relied to terminate his employment.

VIII

The court now considers whether Ryerson is entitled to summary judgment dismissing Chambers' ERISA claim.

A

Section 510 of ERISA "makes it unlawful for a person to discriminate against a plan participant for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *Sabrah v. Lucent Techs., Inc.*, 1998 WL 792503, at *10 (N.D. Tex. Nov. 6, 1998) (Fitzwater, J.) (citing 29 U.S.C. § 1140). Chambers alleges that Ryerson unlawfully discharged him, in violation of § 510, by purposefully interfering with his attainment of rights to which he would have become entitled under the employee welfare plan providing disability benefits ("Plan").

To sustain a valid § 510 claim, an employee must make a prima facie showing that there was a "prohibited (adverse) employer action (2) taken for the purpose of interfering with the attainment of (3) any right to which the employee is entitled." *Bodine v. Employers Cas. Co.*, 352 F.3d 245, 250 (5th Cir. 2003) (citing *Van Zandt v. Todd Shipyards Corp.*, 847 F. Supp. 69, 72 (S.D. Tex. 1994). "The plaintiff need not prove that the discriminatory reason was the only reason for discharge, but he must show that the loss of benefits was more than an incidental loss from his discharge." *Chambers v. Raines Elec., L.P.*, 2005 WL 3555118, at *2

- 30 -

(N.D. Tex. Nov. 1, 2005) (Lynn, J.) (citing *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 260 (5th Cir. 2001)). "A plaintiff must show specific intent to retaliate for the exercise of an ERISA right, or to prevent attainment of benefits he would become entitled to under the plan." *Id.* (citing *Stafford v. True Temper Sports*, 123 F.3d 291, 295 (5th Cir. 1997) (per curiam)). "A plaintiff may prove these elements by using circumstantial evidence." *Id.* (citing *Holtzclaw*, 255 F.3d at 260). Once the plaintiff makes his prima facie showing, the court will continue to the next step of the *McDonnell Douglas* burden-shifting framework, requiring the defendant to articulate a nondiscriminatory reason for the adverse employment action. *Id.; Krisher v. Xerox Corp.*, 102 F.Supp.2d 715, 722 (N.D. Tex. 1999) (Sanderson, J.). "Once such a non-discriminatory reason is articulated, the plaintiff must prove that the defendant was motivated by 'the specific intent of interfering with the plaintiff's ERISA benefits.'" *Krisher*, 102 F.Supp.2d at 722 (quoting *Stafford*, 123 F.3d at 295).

B

Because Ryerson has pointed to the absence of evidence to support Chambers' § 510 claim, to overcome summary judgment, Chambers must produce evidence that would permit a reasonable jury to find, *inter alia*, that Ryerson terminated him with the specific intent to interfere with an ERISA right to which he may become entitled. *Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364, 368 (5th

Cir. 2005).  Even assuming that Chambers may have become entitled
to coverage under the Plan, he has not adduced sufficient facts
from which a reasonable jury could find that in terminating his
employment, Ryerson was motivated by the specific intent to
interfere with his ERISA benefits.  *Krisher*, 102 F.Supp.2d at 722.

As evidence of specific intent, Chambers alleges that Ryerson
had knowledge of his intestinal surgery, damaged right hand, and
deteriorating right eye.  He argues that the reason his skilled job
was abolished and he was reassigned to another shift was because
Ryerson was "[c]oncerned that Chambers might be gearing up to
request benefits under the Pension[.]"  P. Br. 43.  Chambers then
argues that his termination only two months after his return to
work after his intestinal surgery is sufficient evidence to permit
the trier of fact to infer either a retaliatory motive for
exercising his rights under the Sickness and Accidents Plan
benefits or an action to prevent him from attaining further
benefits under the Sickness and Accidents Plan or under the
Pension.  He next points to the inclusion in the LCA of the
provision extending the agreement for any days he took off for sick
leave during the 12-month probationary period, and he argues that
this provision served as a punitive measure for making further
sickness and accident claims.

Ryerson points in reply to Chambers' deposition testimony, in
which he explained that Ryerson eliminated his saw operator

position because "they [weren't] getting enough orders to maintain the job opening," and conceded that he did not believe his surgery had anything to do with Ryerson's decision to eliminate the position.    D. App. 73.    Ryerson also argues that Chambers' allegation that Ryerson "knew" he would seek benefits under the Plan is mere speculation.   After his intestinal surgery, Chambers' physician released him to return to work without restriction, suggesting that he was not incapacitated due to the surgery. Ryerson maintains that Chambers' need for bifocals is common among employees over age 40, and this fact would not have put Ryerson on notice that Chambers might someday qualify for Plan benefits. Further, Ryerson points to the fact that it provided disability retirement benefits to at least three other employees, including an African-American   employee,   further   dispelling   any   possible inference of intent.

C

Chambers has failed to produce evidence that would permit a reasonable jury to find that Ryerson terminated his employment with the specific intent of denying him benefits to which he may have become entitled under the Plan.   Chambers bases his § 510 claim on conclusory allegations and speculation about whether Ryerson knew that he may become entitled to Plan benefits.   But these conclusory allegations are insufficient to raise a genuine issue of material fact regarding whether Ryerson had specific discriminatory intent

to deny him benefits under the plan. *Juarez-Keith v. U.S. Foodservice, Inc.*, 2005 WL 548074, at *10 (N.D. Tex. Mar. 8, 2005) (Lindsay, J.) ("Plaintiff only makes conclusory statements that Defendant retaliated against her for requesting benefits under the Plan. Plaintiff has offered no competent summary judgment evidence raising a genuine issue of material fact on the essential element of her retaliation claim, namely, that Foodservice had specific discriminatory intent to deny her benefits under the Plan[.]"), *aff'd*, 192 Fed. Appx. 249 (5th Cir. Jun 29, 2006). Likewise, the temporal proximity between Chambers' sick leave and his termination is insufficient, without more, to raise a fact issue. *See Chambers*, 2005 WL 3555118, at *3 (refusing to find specific intent based only on evidence of temporal proximity); *Bernal v. Randall Food & Drugs, Inc.*, 1998 WL 246640, at *14 (N.D. Tex., Mar. 24, 1998) (Buchmeyer, C.J.) ("No evidence other than the temporal proximity between the plaintiff's final incursion of medical expenses and his discharge has been placed before the court linking the plaintiff's employment termination to the exercise of his right to benefits pursuant to the Plan . . . . To infer that [defendant] intended to interfere with Plaintiff's entitlement to ERISA benefits . . . [would] be speculative."). Moreover, a reasonable trier of fact could not find that the inclusion of the provision creating an extension in the 12-month probationary period for any time Chambers was on sick leave establishes that Ryerson terminated

Chambers' employment in order to deny him Plan benefits.[14]

A reasonable jury could only find that Chambers' employment at Ryerson was terminated because he violated three Conduct Rules, and Rule 23.   Because Chambers has not adduced summary judgment evidence that would permit a reasonable finding that Ryerson had a specific discriminatory intent to deny him any right or benefit to which he was entitled under the Plan, Ryerson is entitled to judgment dismissing his ERISA claim.

---

[14]Ryerson argues in its reply brief that Chambers impermissibly expanded his ERISA claim beyond the scope of the complaint by arguing in his response brief that Ryerson terminated and/or "harassed" him for the purpose of interfering with his attainment of rights.   In his complaint, Chambers alleges that "[b]y terminating Chambers, Defendants purposely interfered with Chambers' attainment of rights to which he would have become entitled under an employee welfare plan providing disability benefits."   Am. Compl. ¶ 42.   He does not allege in his complaint that Ryerson "harassed" him for the purpose of interfering with his disability benefit rights.   Chambers cannot recover for harassment in violation of ERISA because this claim has not been pleaded; Chambers only asserts a claim for unlawful *discharge* in violation of ERISA.

*       *       *

For the foregoing reasons, the court grants Ryerson's motion for summary judgment, and it dismisses this case with prejudice by judgment filed today.

**SO ORDERED.**

July 2, 2007.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

– 36 –